Today's case is number 25-1611 and number 25-1612. American Public Health Association at all versus National Institutes of Health at all, Commonwealth of Massachusetts at all versus Robert F. Kennedy, Jr. at all. At this time, would counsel for the appellants please come to the podium and introduce himself on the record to begin. Thank you. May it please the court. Benjamin White for the United States. I'd like to reserve four minutes for rebuttal. If that will work? It will. Thank you. So unless this court has specific questions about the district court's vacunar of the grant terminations in light of the Supreme Court's rulings on that subject and this court's decision issued yesterday acknowledging the clear import of that decision on whether or not the district court had the jurisdiction to act as it did, I want to begin by talking about why the district court's vacunar of the agency's grant priorities guidance, the so-called challenge directives, should also not be affirmed. To start, there's no evidence that the challenge directives themselves caused any independent injury. The only injury supported by the record is the grant terminations. That was the injury that the plaintiffs pled in their complaint. That was the injury that plaintiffs argued gave them standing. That was the injury that the district court found in finding that the challenge directives were part of a larger grant termination action. And in fact, the district court viewed the challenge directives as merely the paper trail, justifying the grant terminations rather than causing some independent effect. But wouldn't that suggest that the universe of circumstances to which Justice Barrett's concurrence would apply is zero? No, Your Honor. To the extent that there is some guidance that actually directs something much more specific than what happened here, I do think it's important not to lose sight of what the challenge directives actually state. But that opinion was written in the context of grant terminations, was it not? It was. So don't we reasonably read it as saying that in the case of grant terminations, there could be a challenge to policies, at least possibly? Correct, Your Honor. Just not. It's not supported in this case. As this case was litigated and tried before the district court, the only injury that the plaintiffs ever asserted and the district court ever found related to the grant terminations. Now, it's a hypothetical. Why is that true? Because I understand there's not been a settlement about phase two, and I did want to ask you some questions having to do with the 28J letters that the parties filed, just to make sure I understand the facts as they stand. But just putting those aside for a minute, they absolutely challenged the termination of grants, as you said. But they also said that they had grant applications pending. And as I understand it, researchers and institutions often conduct research based on their expertise in certain set areas that they have been studying. And so this categorically bars some researchers and institutions from seeking NIH grants based on the challenge directives. Why aren't those things harms? Well, I think I want to break your question up into two parts. The first regard to the application of the challenge directives to plaintiff's grant applications going forward. That wasn't part of the trial that led to the order currently under review. That was clearly part of the phase two trial that has, as you noted, now been settled. But that evidence that could have been adduced in phase two doesn't support injury for this particular order. With respect to your second question. Why is that, counsel? I'm just struggling to understand why that would be true. We know that the pending applications exist. You don't contest the real world fact that there are pending applications. So if we're just trying to figure out if there's an injury, why is the fact that the impact of that injury and the remedy for that injury hasn't been tried yet eliminate the injury itself? Well, I think that under this court's precedence, the injury has to be established at each phase of the litigation and what constitutes sufficiency to establish that injury changes depending on the phase. And because we're actually post-partial final judgment, there needs to be evidence in the record supporting that injury. And that evidence was deferred by the district court for phase two. But don't you, let me try it another way. I thought you've effectively conceded that the injury exists because there's a chart attached to the Jacobson Declaration, if I have the name correctly, the name correct, which says that certain applications that were pending were administratively denied because of the challenge directive. So what absence of, just when we're talking about injury, I understand you may disagree about the impact of the injury. But whether the injury occurred, what is the dispute? I thought it was conceded. Well, again, I think that injury that you're referring to is something that the court wanted to consider in phase two of the trial regarding applications. Phase one of the trial, I think, was very clearly focused on the grant terminations. And so that was the injury that the parties presented evidence on, that was the injury that the district court found. And to the extent that there may be standing for plaintiffs to bring the phase two challenge, to the extent that it's supported, doesn't support the phase one, standing for phase one. Perhaps I could just ask one more, just very directly. Do you contest that there were pending applications that were administratively denied because of the challenge directives? No, I think that is part of the phase two trial. No, I'm not asking if what phase it's in or not. And I'm asking you as a factual matter. Do you contest that there were pending applications that were administratively denied because of the challenge directives? I think that's what the record indicates, that there were. But I don't think that that necessarily establishes jurisdiction for an order that vacates the grant terminations as a result of this particular phase of the trial. It's a little bit peculiar because the district court did not decide to fully adjudicate all the claims before it. They decided to split the case into two pieces. And that has jurisdictional, I think, impacts in addition to substantive impacts on what claims the court was considering. And one of the consequences of that splitting was that evidence regarding future grant termination, or future grant applications in the application of guidance to those applications, the court was reserving judgment on. Plaintiffs also posit the alternative argument about injury, that the challenge directives might be used to terminate some of their existing grants in the future. I think that's purely speculative. Plaintiffs have not identified any specific grants that were not terminated originally that they believe have a real chance of termination going forward under the challenge directives. And in fact, they can't do that. And there's really no scenario in which that could occur. Because, and this brings me to my second point, which is that there really is no live controversy remaining regarding the challenge directives. The agency has issued new guidance that materially changes how its priorities are described and the procedures that the agency is to be using to make sure that its grant portfolio is aligned with its priorities. And there's really no scenario, irrespective of whether or not the district court's vacuna remains in place, that the agency would go and apply the challenge directives. It has new guidance. It will apply that new guidance going forward. I'm still trying to figure out how there comes to be an adjudication of a challenge directive. Government issues a directive. A termination is then made based on the directive, a termination of a grant, and in reliance on the directive. The grant recipient can't challenge that in district court. Has to go to the Court of Federal Claims. They go to the Court of Federal Claims, and the government responds by saying, hey, we were just acting pursuant to the directive. That's our justification. Plaintiff grant recipient then says, well, the directive was itself unlawful. Court of Federal Claims says, I can't adjudicate that. I can only adjudicate the grant termination. So the recipient then starts a separate APA action saying the directive is unlawful. And you say, no standing because the only injury is the grant termination, and that's over in the other court. That doesn't seem to make sense. That seems to essentially say that the notion of splitting the two in the grant termination context destroys the possibility of ever having any challenge brought that rests on the illegality of the grant directive. No, Your Honor, that's not what we're arguing. Well, then how would it work? Let's assume there's an unlawful directive, and then a grant is terminated pursuant to that directive. How does the grant recipient successfully challenge that? Well, I think that to the extent that there is a grant termination, the Supreme Court has made clear that the proper forum for challenging that decision is the Court of Federal Claims. And in that go there, and the defense is the directive told us to do this. That may well be a defense that is asserted, but in the Court of Federal Claims, the inquiry that the court would be examining is whether or not the government's actions are consistent with the terms of the contract. Was the government, in fact, entitled to terminate the contract or not? Could the Court of Federal Claims offer any opinion on the legality of the directive pursuant to which the government says it acted? I mean, in the context of deciding what the obligations and responsibilities imposed by the contract, I don't think that obligations imposed by regulation are categorically excluded. I think that that would be a decision for the Court of Federal Claims to decide in terms of what are proper considerations for claims before it. But again, Well, isn't it your position that the Court of Federal Claims would not have jurisdiction to decide whether the directive is lawful? True. Correct, Your Honor. How do they ever challenge a grant termination that's based on the directive which they allege is unlawful? Because the challenge in the Court of Federal Claims would have to be whether or not any of the rights imposed by contract are violated. And it may well be that under the terms of the contract, obligations, I mean, the following of an invalid regulation might be one of the grounds for plaintiff's successful contractual challenge. But that is a decision for the Court of Claims. It's not something that's properly adjudicated in district court. It's like you're saying there might be a unicorn. I don't see any real world example of that. Certainly the grants here, none of them have, at least the ones that have come to light, don't have any provision saying what you just said. Well, I think that the Court of Claims would be applying established contract principles and determining whether or not the government acted in accordance with that. One of those potential principles is acting in good faith and fair dealing. I don't want to say that that certainly is a claim that would have merit. But I'm saying that the claims court, in analyzing a contract-based claim, is not precluded from assessing evidence of the type that you're describing. And I do also want to, I guess, take a step back. And your concern about the challenge to the guidance, it's not the case that plaintiffs would never have standing to challenge the guidance. In fact, to the extent that they are arguing that the guidance impacted their grant applications and they could provide evidence that that was, in fact, the case, that certainly would provide standing in the context of the agency's consideration of grant applications. But it doesn't suffice now for this order because this order didn't consider that issue. So I want to be clear that the plaintiffs not lack standing here to challenge the grant terminations, at least for injury purposes, excuse me, the guidance. But it's not to say that they could never establish that injury. But I also think it's important to touch on the fact that challenges to the grant termination guidance, in this case, the challenge directives, also suffer from some additional defects. Again, there is no longer any live controversy about the challenge directives. They will not be applied in the future. Indeed, can you be more specific about that? I think you're returning to something that you were already talking about. We have 10, I think roughly 10, guidance documents here. And you say they've effectively been overridden. And you give a few examples in your briefs. But don't we have to look at each one of those and decide whether there's still a live controversy there? And first of all, answer that question. But then secondly, what is your position as to those documents entirely? Well, I think that the guidance as a whole has been superseded. I think the December 12th guidance that was the subject of the 28J letter makes that clear in terms of the prior guidance no longer being in effect. But I also, to the extent that the new guidance, especially the August 15th director statement, sort of changes some pieces of what was previously in effect, I think it's important to note that what was changed directly addressed many of the concerns that the district court identified. In terms of the NIH guidance, and I think Judge Rickleman probably might have a question on this too, but can you explain your 28J letter? Because I'm just not sure I understand it in that it says the staff guidance does not apply to any grant that is the subject of litigation or court orders. I think that's just a reflection of the agency's caution to the extent that this is not the only case where some of its grant issues are being challenged in litigation. And I think the agency is just being careful with respect to setting blanket rules irrespective of whatever orders may or may not be effect in particular cases. And so it did have this carve out. But it is evidence, I think more broadly, that the agency has moved on from the challenge directives and issued new guidance and new procedures on how it intends going forward to align its grant portfolios with the administration's current priorities. It also seems to be cabined by fiscal year 2026, which I think some of what's before us is guidance that happened before that. Correct, Your Honor. I think that the agency issues guidance year by year. But with respect to any concern about the application of the challenge directives to plaintiffs' outstanding grant applications that were the subject of phase two, the stipulations that were in the 28-J letter, in fact, I think the court ordered dismissal earlier today, state explicitly that the challenge directives will not be applied to plaintiffs' grant applications. So again, there's no scenario in which the challenge directives would be used to evaluate plaintiffs' grant applications. And so there's really no remaining live controversy regarding that fact. Counsel, let me ask you about the December 12th staff guidance document. I'm just trying to understand. I see the language that says that it supersedes earlier guidance from March 2025 through May 2025. But I'm just not sure that I entirely understand what the guidance in this document is that you say supersedes what happened before. Because as I read it, it seems to direct NIH officials to scan for certain terms that could be potentially in misalignment with the agency's positions. But it doesn't say what those terms are or where they come from. So how is this, in your view, superseding what came before? I'm not even sure what it's really instructing the officials to do. Well, I think it does contain some more clarification and explanation about what the agency means when it refers to DEI programs. It gives some concrete examples. Yeah. Could you point us to what in particular you mean? Sure. So for example, the guidance gives the examples that grants that focus on poorly defined, sort of ambiguous terms, such as health equity and structural racism, are things that the agency doesn't prioritize as research. And it gives sort of a- Isn't that just exactly what the challenge directive said? I guess that's what I'm asking. That, to me, sounded like almost essentially word for word what we saw in the challenge directives. I don't see how this is different. I see my time has expired. To answer your question, the challenge directives didn't give sort of concrete examples. And that was the reason the district court, in fact, faulted the directives for not providing- Do directives say generally that grants focused on equity were going to be terminated? I think that- The word equity, and this uses the word equity. So again, I'm just trying to understand how this is actually substantively different. It does. I think it's substantively different to the extent later on in that same paragraph. It expressly authorizes and says that studies that explicitly consider racial, and ethnic, and gender minorities is something that is permitted under the agency's new priorities to the extent that those are scientifically justified. And so it does provide a little bit more explanation as to what grants are agency priorities or not under the overarching directive that sort of amorphous equity-based kind of research not scientifically defined is not. So the premise of your mootness argument is that the new guidance eliminates the problematic or what the courts have found to be the problematic aspects of the first guidance. I think the premise of the mootness argument is that new guidance supplants the old guidance. And I think that the fact that the changes are not merely semantics, that the agency was not merely playing games with adding a word or changing a word, but making real substantive changes to the guidance shows that it was really part of the agency's ongoing process to review its grant portfolios versus some contrived means to avoid this court's review. Well, suppose it does not eliminate a problematic aspect of the first guidance. Are you still saying the challenge to the first guidance is moot? The new guidance, excuse me, the original guidance is no longer in effect. So any challenge to it is moot. To the extent that the new guidance contains either similar problems or new problems, plaintiffs are free to challenge that in the appropriate form. Though again, I think they run into other threshold issues, such as the fact that it's not a final agency action and also that it's consigned to agency discretion. But I don't want to derail it. So suppose you issued a new guidance that was exactly like the first guidance, except it added on one sentence. Well, I think that's not this case, Your Honor. Of course it's not. And I think that to the extent that the new guidance might incorporate some elements of the original guidance doesn't per se make it illegal, because the guidance, again, has to be taken as a whole. So what about if it just did the same guidance, only added the new sentence, added some other point? Well, I think to the extent that the new sentence directly addresses the concerns with the original guidance, which was the case here. That's not the hypothetical I'm asking you. I'm asking if the new guidance just replicated the first guidance, except it had some change. Well, I think that would be a very different case. And I think that the mootness argument would certainly be much more questionable. Well, so to decide whether this case is more like or less like that hypothetical I just gave you, don't we have to form an opinion as to the extent of the differences between the two guidance and whether they are material to the problems that were presented by the first guidance? Not necessarily, Your Honor. I think that to the extent that that particular inquiry, I think, goes into the voluntary cessation doctrine and whether or not the agency is merely trying to avoid review or that there's a reasonable likelihood that the original, that the challenged actions will resume following the litigation. I think that to the extent that there is at least a threshold, clear, and obvious, and undisputable fact, which is that the agency has moved on from the challenge directives, and those will not be applied going forward. I just have just one follow-up question for you on that. If it's the federal government's position that you've put aside the challenge directives, these are new directives. They're substantively different. There's no live controversy. Wouldn't the right thing for us to do would be to dismiss your appeal? You're the appellant here. So if it's really true that all of this is over and you're never going to implement the challenge directives again, why shouldn't we just dismiss the appeal? Well, I think that to avoid the potential for the district court's order to be, again, read to consider the new guidance, that it doesn't prejudge the subsequent guidance that the agency has issued. But if we have no live controversy, how would we issue an opinion saying that? I think that the appropriate remedy would just to be to vacate the district court's decision on the grant priorities guidance. If what you've done is essentially comply, the way you just framed it to us is that the agency issued new guidance to address the concerns that the district court found in concluding that the actions were arbitrary and capricious. So if functionally what you've done, according to you, your client has done is complied with the federal court's order, why would we then vacate that order? You've just done what we would expect, which is comply with the federal court's order, shouldn't we know? And you're saying you're not going to engage in the same actions that led to the order. It just seems that the right outcome would be to dismiss the appeal. Why would we vacate what the district court did when you complied with it? Well, I think that to the extent that the district court's order, if it's affirmed, creates the confusion or perhaps ability for misinterpretation. No, I'm sorry, you're saying that there's no live controversy, meaning that we can't issue a decision. So assuming you're correct, I'm now asking you whether the right next step would be for us to dismiss this appeal. I think the right step would be to vacate the district court's opinion, not to dismiss the appeal. Again, I think that the district court's decision suffers, in addition to the mootness issue and standing issue, suffers from numerous other deficiencies that we identified in the briefs. So if someone orders you not to use that lectern, that's the injunction. You comply with it by destroying the lectern, so you can't use it anymore. Someone would say you simply complied with the injunction. As I hear what you're saying, you'd say the case is now moot, or we should vacate the injunction because it can no longer be a violation of it. I think that's correct, Your Honor, and also to the extent that there is still a part of the appeal, which is the district court's vacater of the grant terminations. And so I think the appeal is still alive regardless, and this court needs to rule on whether or not the district court's action in that regard, reversing grant terminations, is something that should be affirmed or not. And if the court dismisses the government's appeal in its entirety, then it effectively allows the district court to reverse those grant terminations, which, again, I don't think is the proper application of Supreme Court precedent and this court's decision that was issued yesterday. Thank you. Thank you, counsel. At this time, would counsel for the American Public Health Association please introduce yourself on the record to begin? May it please the court. Rachel Marple from the ACLU. Along with my colleagues, I represent the plaintiffs in APHA versus NIH. As the court is aware, this case involves HHS and NIH directives mandating the termination of so-called DEI and gender identity research, among other forbidden topics. Defendants applied the directives to terminate midstream, thousands of peer-reviewed, competitively funded projects, including, for example, research to reduce kidney health disparities and to understand cardiovascular health in the rural South. This is life-saving science. So why is there still a life controversy here? I'm happy to begin with the question of mootness, Your Honor. First of all, we heard a disavowal from the podium of the intent to continue to apply the directives. There has been no disavowal in writing of the question of whether the directives would be used in the future if the court order below was vacated. In fact, if we look at the August 15th statement that defendants argue was initially the basis for their mootness argument, that statement certainly doesn't state that it has superseded any of the vacated directives. It states that it's clarifying the guidance in those directives. What about the December 12th? The December 12th statement, after we filed a brief pointing out that the August 15th statement doesn't say that it's superseding the other directives, certainly the 12-12 statement does include those words that it's superseding, but we also have statements from the director of the NIH, which the state submitted a supplemental authority yesterday, indicating that when all of these grants come up for renewal in the next budget year, they will all be denied renewal because they're all DEI research and the NIH no longer prioritizes DEI research. There's no statement, the letters DEI, doesn't appear in the 12-12 state guidance or the August 15th statement at all. Are you discussing the NIH director's statement to the media? Yes, yes. Can we rely on that at this point? I mean, it is just a quote in a news article and I'm trying to figure out how it actually fits in to the arguments that you and your opposing counsel are making. It is, of course, outside the record, but given that mootness is about the continuing impact of policies over time, facts related to mootness are always, by necessity, going to be outside the record. Here, it's the defendant's formidable, heavy burden to show that there is absolutely no chance that the directives will continue to be used and that the impact of those directives are eradicated. So defendants have the burden here to show that they will not continue to use the directives. Why haven't they met that burden with the December 12th statement? Because as you said, that statement begins with an introductory paragraph saying quite clearly that it is rescinding all of the previous guidance that was issued from February through May. Well, so- So why isn't that enough to meet their burden? It says that it's applying guidance to, the guidance itself, the 12-12 guidance, talks about interpreting the August 15th statement. And when defendants talk in their brief about the impact of the August 15th statement on the directives and the policy going forward, they talk about the fact, for example, this is in their reply brief at page 12, that plaintiffs have identified no scenario in which defendants would apply the vacated guidance to them without the additional clarifications of the 8-15 statement. So I think we have contradictory evidence here in the record from the government as to whether the directives continue to have some impact or not. But even if we could take at face value the statement from the podium, not in writing, that there is a disavowal of the intent to use the directives in the future if the court's order is lifted, mootness also requires a showing that all of the impacts of the challenged directives have been eradicated. And here, there are hundreds of terminated grants that are still terminated. We have individuals who cannot seek funding going forward because the NIH has expressed its priorities that it no longer funds DEI research. I guess the question is, according to your opposing counsel, if that's been stated in a new document, then you would need to bring a lawsuit about this new document. And to just, if I can just follow up with you a little bit more on this issue. I mean, I'm just looking at page one, I believe, of this 12-12 staff guidance, and it says quite clearly, this is not couched. I'm quoting, this staff guidance supersedes the staff guidance issued by OPERA in March 2025 through May 2025. That implemented the February 21, 2025 statement, the prior staff guidance is no longer in effect. That doesn't seem like a conditional statement. That it's no longer in effect doesn't mean that the directives wouldn't be put into effect if the court's order vacating them and setting them aside is not lifted. So when we look, for example, at some of the Supreme Court law on mootness, a change in policy, even when that change at the moment that the court is considering it is absolute, doesn't bind the government from going back to their old ways once the court's order is lifted. But also the statement that your honor pointed out earlier in the guidance about the fact that on its terms, the 12-12 statement doesn't apply to the grants in this case. I think that statement really contradicts the government's position that the new guidance completely replaces the old. If the new guidance completely replaced the old, logically, why couldn't it apply to the grants in this case? It's only if the new guidance truly is an attempt to clarify, to cure the orders of the old guidance, but the guidance, the old directives will continue to impact the plaintiffs in this case, that there's a worry by the United States that it can't apply this new guidance to this case. And the 12-12 statement specifically says new guidance will be forthcoming about those grants in this case. We haven't seen that new guidance yet. I don't, can we look at this as simply saying the district court found the government was doing something wrong with its guidance. If the government comes in now and convincingly argues and demonstrates that it's no longer doing the thing that the court found was wrong, it won't going forward and it has no intention or desire to, wouldn't that raise the possibility that the government's appeal is moot? Not that the case is moot, the case is just, the appeal is moot because it's no longer a matter of interest to either party or to the government to challenge the injunction. Well, I think as to the directives claim, that makes sense, Your Honor, and that's why courts generally don't vacate a district court order when mootness is caused by defendant's voluntary cessation of the challenged activity. The case that defendants cite when they say that the proper remedy here is to vacate the district court's decision, itself recites that black letter law that you don't vacate a district court decision when voluntary cessation is what has ended the illegal activity. Now that said, that is still the matter of the district court's vacature of the grant terminations. And I would love to be able to turn to that question for a moment unless the court has other questions for me about mootness or about the mootness question. So the Supreme Court's order is not determinative on the merits of the appeal to the district court's vacature of the grant terminations for four distinct reasons. First, neither the per curiam order nor Justice Barrett's concurrence address the district court's ability to remedy the directives claim through setting aside the terminations. And that is established through binding Supreme Court precedent. Second, defendant's only argument against the district court's jurisdiction over the contrary to law claim, this is count two, that we won in the district court but wasn't remedied by the district court judge is, and that claim is based on NIH's violation of their own regulations. Defendant's only argument about why that, the district court shouldn't have jurisdiction over that claim is by the megapulse itself which defendants rely on. Third, defendants presented to the Supreme Court a fictitious some pass due. And fourth, defendants have now failed despite prompting to identify statutory authority to bind the United States in contract. I'm gonna start with complete relief. Everyone agrees that there is jurisdiction under 702 of the APA over the challenge to the directives. Because the district court had authority over the directives claim, it also had authority to order complete relief over that claim. Now the stay order disclaims APA jurisdiction to adjudicate claims based on the research related grants or to order relief designed to enforce an obligation to pay money pursuant to those grants. I see my time is up, may I continue? Briefly. Thank you. The second clause regarding ordering relief has to be understood to apply only to relief on the grant based claims. Otherwise, if 702-2 is understood to preclude a certain remedy without regard to the claim being remedied, it runs headfirst into the Supreme Court's holding in Machi Benashewish Band v. Patchak, in which the Supreme Court held, and I'm quoting here, limitations on relief cannot sensibly be understood apart from the claims to which they attach. Can I just ask you though, I understand your argument, but for the purposes of understanding the Supreme Court's stay opinion, you agree that Justice Barrett's concurrence is the controlling opinion. And I'm just trying to understand how we can square your argument with what she said in her concurrence, which is, and I'm roughly quoting, that if the Court of Federal Claims has exclusive jurisdiction over the grant terminations, you, the plaintiffs, can't do an end round around that by packaging the terminations with a challenge to the agency guidance. So the thrust of what she's saying there seems to undermine your argument, and I just want to give you a chance to respond. I'm not sure how you're squaring it with what she said very clearly. Yeah, thank you, Your Honor. What Justice Barrett is analyzing there is the question of whether the fact that the district court is the proper forum for the directive's claim means it's also the proper forum for the termination's claim. If we read that as higher paragraph, I understand how you're trying to parse it, but from a practical perspective, if her concurrence says you can challenge these grant, you cannot challenge these grant terminations in district court, and what you're proposing is essentially that you can get the relief you want by just packaging it with the guidance, doesn't that just run headlong into what her controlling concurrence held? I don't think so, Your Honor, because if that's the way we understood it, how do you square that with Patch Act? That's exactly the situation in Patch Act, that's an 8-1 Supreme Court merits decision from 2012, where the Supreme Court said, the plaintiff in that case, the relief the plaintiff in that case was seeking through his APA claim would have been barred if it were a Quiet Title Act claim, and the Supreme Court says it doesn't matter that this relief would be barred for a Quiet Title Act claim, because it's not a Quiet Title Act claim, because it's not a Quiet Title claim, the Quiet Title Act simply has no application here, we can't look at relief separately from the claim that is being remedied, that would make no sense, and that's not what the Tucker Act requires, that's not what the Quiet Title Act requires, that's not what the APA says, so when the Supreme Court interpreted 7022 of the APA, not that long ago, it faced a quite similar situation, the Justice Barrett's concurrence doesn't grapple with the question of how do you square Patch Act with the situation where the court might decide that a grant terminations claim goes to the Court of Federal Claims, but the directives claim stays in the District Court, that is not something that was considered that was briefed below, none of the Supreme Court concurrences, dissents, or the per curiam order address that scenario, because that concept of sending the two claims to two different places didn't arise until Justice Barrett issued her controlling concurrence, but if we look at that concurrence, we see that at each step of her analysis, she is talking about do the two claims rise and fall together, it makes sense she'd be focused on that, because that was the question in Bowen, it seems she's responding to what the Supreme Court did in Bowen when it kept those two claims together, there's nothing in her concurrence that suggests when a District Court has jurisdiction over a claim, such as it does over the directives claim, the fact that a different type of claim couldn't be remedied in the District Court, somehow divest the District Court of Jurisdiction to issue complete relief to the parties before it in the claim it has jurisdiction over, now this issue, it's going to have to be decided by the Supreme Court at some point, and I think it's worth pointing out that the practical impact of the way emergency stays work in the Supreme Court, is that the Supreme Court is going to stay in effect unless the Supreme Court lifts it, that means the District Court's order will not go into effect, vacating the District Court, vacating the terminations, unless the Supreme Court decides that's the right thing to happen, that means that this court has the power to say what the law is, and the more well-reasoned decisions we have from lower courts analyzing this very complicated question of how Patchak interacts with this question of whether you can get relief on grant termination, on grant termination claims, or a relief of setting aside a grant termination when it's the implementation of the agency's illegal policy. You know, the more well-reasoned decisions we get, the better off the Supreme Court is, that is how our system works. Your time is up. Thank you, Your Honor. Thank you, Counsel. At this time, would Counsel for the Appalese, Commonwealth of Massachusetts et al, please introduce yourself on the record to begin. Thank you. Thank you. Good afternoon, Gerard Cedrone from the Massachusetts Attorney General's Office on behalf of the 16 plaintiff states in the Massachusetts against Kennedy case. I'm, of course, happy to answer any questions, but I'd like to focus, if I can, on two principal issues. One is the merits, and the other is the question of injury, mootness, and standing. First, starting with the merits, I'd like to start there just because I don't want to lose sight of it. The federal government obviously has plenty of threshold arguments, but the brief almost treats the merits as an afterthought, and it didn't come up on the top side of the argument today. I think that's because the district court's decision was unassailably correct. The challenge directives were arbitrary and capricious. There are a number of reasons why that's so that we get into on our brief. I'll just linger on one of them, which is reliance interests. The Supreme Court has made clear again and again in cases like the DACA decision case, DHS versus Regents, that when an agency is changing TAC, it has to assess whether there are reliance interests, decide whether they're significant, and weigh them against its other policy considerations. You will look at this administrative record in vain for any instance when the federal government did anything of the sort. And there are significant reliance interests here as this court's stay decision recognized. Just speaking close to home, the Barton Declaration at ECF 7745 goes through the real costs to the University of Massachusetts from decisions like the ones that the federal government reached here. Labs closing, graduate programs decimated, hiring freezes, furloughs. There is nothing in the administrative record considering any of that. That's stunning on a human level, and it's unlawful because the APA requires defendants to consider those factors. The only response I see in the government's brief to that point is, well, we have the discretion to terminate grants at will. That's wrong for the reasons we've explained, but even if it were right, the Supreme Court rejected that exact kind of reasoning in DHS against Regents and the DACA case. The federal government made a similar argument there. It said DACA is discretionary. The memo says it confers no substantive rights. We have to decide whether to reissue it every two years. The Supreme Court said, no, that all goes to the strength of your reliance interests, but the agency still has to consider it, and there's nothing like that here. Turning to the... Could you move to the mootness argument? Exactly, that's where I was turning next. So what's your best argument that this case is not taken into consideration, the recent 20HA letters and counsel's words at argument today? Sure, and I do wanna tease apart standing and mootness because they are distinct concepts. I'll start with mootness, but I also want to address standing as well. My answer to that is that the Supreme Court has been clear that mootness is a heavy, stringent, formidable burden. Those are all the Supreme Court's adjectives from the case law on this, and the government hasn't met it here. So just as an initial matter, as I read the December 12th guidance that the government cited late last week, it says it exempts grants that are the subject of litigation. As I read that language, and I didn't hear something to the contrary, that would seem to carve out everything that's at issue in this case. Even if we're wrong about that, then, and even assuming that the December 12th guidance rescinds all of the prior directives, which I don't think it does. I don't see any mention of what's sometimes referred to as the secretarial directive, but sort of even making all of these assumptions, everything is rescinded. It says nothing else that we challenged is still in effect. Then we're just in the universe of voluntary cessation, and there's a two-part test that defendants have to meet. They have to show that it is absolutely clear, those are the Supreme Court's words, absolutely clear that there's no reasonable chance that they'll go back to their prior unlawful policy, and that they have completely and irrevocably eradicated, again, the Supreme Court's words, completely and irrevocably eradicated the effects of their wrongdoing. They haven't done either of those things. So let me start with whether it's absolutely clear that they're not going to go back to their prior unlawful policies. I think the two most helpful cases for this are this court's decisions in Adams against Bowater, which we discussed at page 46 of our brief, and Conservation Law Foundation, which we discussed at page 44 of our brief. Council, can I just ask you factually though, you just mentioned that the 1212 staff guidance doesn't mention the 210 secretarial directive, but I thought that that was the pause directive, and I thought that actually itself was rescinded several days later, and so hadn't been in effect for a long time, if I remember correctly. As I understand that directive, there were two components. The pause was lifted, essentially. There was a pause component of it, but there were also statements in the directive setting forth NIH's unequivocal policy statements. It is the policy of NIH not to support DEI research, all the sort of language that we've become familiar with over that litigation. So I think it's fair to read that as containing a pause feature that's maybe no longer in effect, but also a broader statement of policy that we are challenging as part of this case. If we just assume for a moment, let's just assume that the 210 directive was listed here, and I understand your point that it's not, because it begins with February 21, but why isn't this enough? I mean, it says the prior guidance is no longer in effect. Everything else has been superseded. I mean, it's very explicit. And I think your co-counsel argued, you think that it needed to add an additional clause, and we promise we will never institute the challenge directives in the future. Is that the reason why you think it's not enough? I think something like that would get us closer, but I guess I'll make two points, one about sort of the doctrine and one about the real world facts that got us here. So just in terms of the doctrine, the Adams against Bowater case I mentioned was in a similar posture. It was a private company's ERISA plan, but the plaintiffs there challenged the terms of the ERISA plan while the litigation was ongoing. The company said, okay, fine, we'll amend the plan. We'll put it back to the way it was before. And this court explained that that's not enough because there was nothing preventing the company the next day, if the judgment was vacated, from going back to what it had done before. And I think the same is true here. If this court vacates the judgment below, which was, is, and continues to provide us real relief for real injuries, there's nothing that prevents the federal government tomorrow from deciding, actually, you know what? We liked the challenge directives after all. And that brings me to the point about the history of how we got here, which I think gives every reason to expect that that might happen. As I think Your Honor's questions got at, this is not a case where there's some sort of exogenous change of heart. The federal government adopted unlawful policies. We sue them. They vehemently deny the unlawfulness of their policies. We vigorously litigate the case. They lose. The district court enters a judgment. And then months later, they start taking steps, begrudging halting steps, but steps to comply with the judgment. That's not mootness. And it's certainly not the kind of voluntary cessation that makes it absolutely clear they're not going to go back to what they were doing before. And to the question about Director Bonacciari's statements, I think Your Honor can consider them. They are public statements. It's, you know, it's a, and I don't take the federal government to dispute their authenticity. But the burden here is on them. The burden here is on the federal government to show there is, it is absolutely clear that there is no reasonable chance they'll go back to the directives. And I think it would be, it would be, I don't think our clients can have reasonable comfort that if the judgment below is vacated, in light of everything that's happened, and in light of what the NIH director continues to say, that they won't go back to the exact policies that we persuaded the district court to overturn. Just briefly on standing and on the injuries we've suffered, standing is assessed at the time of the complaint. The Supreme Court made that clear in Lujan. This court has subsequently reiterated that. And so casting your mind back to last April, when we filed the complaint. We had injuries from past terminations. I think, for the reasons we've explained in the brief, that can still provide an Article III injury to challenge the directives, even if we need to go to the Court of Claims for money damages. But putting those aside, because I recognize they're messy, we still have applications that came up in questioning with counsel on the other side. Applications that were, at the time we filed the complaint, already denied. And applications that were facing imminent denial. And that actually happened. So there's no question that at the moment we filed our complaint, we had injuries that we were suffering, that were traceable to the directives, and that were redressable by a judgment from the district court. So the only question is whether something happened afterwards to remove that standing. The only things the government points to are, number one, these later directives, which, for the reasons I've explained, don't moot the case. The only other thing is subsequent proceedings in the district court, and the kind of bifurcation, and whether that posture somehow moots the case. It doesn't. First of all, my friend on the other side is just wrong about the way he describes a complaint and the bifurcation. And I would point the court to footnote 12 of our red brief, where we walk through the numerous times the district court had to correct the federal government about the scope of phase one. The federal government engaged in a pretty concerted effort in the district court to say, phase one is just about terminations. And again and again, Judge Young said, no, no, no. We're talking about terminations, but we're talking about it also in the context of the antecedent question of whether these directives are lawful. And that's because there's injuries that flow from the directives that are more than just the terminations. And there are injuries that flow from the directives, and that were remedied by the judgment below, that are not remedied by the stipulation of phase two. That's exactly what I was about to ask you. Given the phase two settlement, can you explain to us what, in the real world, the district court's judgment is doing? And given the stay by the Supreme Court of the grant terminations, what is the part of the judgment that has remained in force done for you and your clients and your co-counsel's clients in the real world? It would be helpful to understand that. Yeah, so the phase two stipulation applies to a certain subset of applications. They have to have been filed by a certain date. They have to meet certain criteria. But there are applications that are outside that bounded universe of applications. As your Honor pointed out, people develop their careers in a specific area and continue to file applications in whether it's trans health, whether it's certain minority health-related conditions. So there are applications that have been filed, that are pending, that wouldn't be covered by the challenge directives, but for the judgment below, and that are outside the scope of the stipulation. Because, for example, applications had to be filed by, and I apologize, I don't have the dates at hand, but there was sort of a tiered system of like, it has to be filed by June.  But these are applications that are associated with your clients. You are in your co-counsel's clients, not filed by other people in the world that are not. No, that's correct. And I'm here on behalf of 16 states and their public institutions. And UC is the biggest recipient of NIH grants. So there's just, there's no reasonable dispute that there are real world applications that are affected by the challenge directives, and the only way that would be, but for the judgment below. And to withdraw that judgment at this time would be a grave error, we believe. And so we ask the court to affirm across the board. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, would counsel please come to the podium and reintroduce himself on the record. He has a four-minute rebuttal. Thank you. May it please the court again. This is Benjamin Webb of the United States. I just briefly want to touch on three points that was raised by the opposing side. First, on mootness, I think that to the extent that plaintiff's arguments about the need for the district court's judgment about the challenge directives to remain in force, about how researchers can't get funding because they research in DEI areas, I think that actually emphasizes the reason why VACADR is justified here, rather than just dismissing the government's appeal in this regard. Because again, I think it's important to realize that the district court's judgment wasn't that the agency improperly set research priorities. It did not say that the agency is not permitted to deprioritize DEI research. It said the agency and the administration is entitled to new policies and to make changes, but it has to define what it's doing. And so the shortcoming that the district court based its entire ruling on was the fact that terms like DEI weren't adequately defined, not that the agency was improperly deprioritizing DEI. And the fact that plaintiffs are raising this as a reason why the case isn't moot, I think highlights the potential confusion of the district court's order were it to remain in place. And that's why I think that VACADR of that decision because of mootness would be appropriate here. Secondly, I think on the merits, the California plaintiffs highlighted the reliance interests that were affected by the grant terminations, and I emphasize that latter part, that to the extent that there were specific reliance interests that were affected that the agency potentially didn't take into account in making a specific decision to terminate a grant, that is a challenge or a defect of the grant termination decision. There's nothing in the guidance itself that prohibits the agency or directs the agency not to take into account reliance interests. And in fact, the guidance does, as the challenge directives even, specifically require the agency when terminating grants to A, try and negotiate out terms where possible, to terminate only where necessary, and where termination is required to allow individuals to request additional funds for an orderly wind down of their research grants. And so the guidance did contemplate some level of reliance interests. And to the extent that plaintiffs think that that was inadequate in a particular case, given the specific declaration that plaintiffs' counsel cites, that's again a challenge to the terminations over which the district court did not have jurisdiction. And just finally, briefly, I think that this court acknowledged in a decision released yesterday about the binding nature, or at least the effect of the Supreme Court's stay decision in this case, and also in California, that clearly establishes that the district court lacked jurisdiction to consider the grant terminations, regardless of whether or not it's packaged with some other challenge to agency action. And I think the court recognized that's controlling there, and it certainly, I think, should be controlling here. Counsel, can I ask you about your opposing counsel's argument on the Patchak case? So they have said it just wasn't an issue, it wasn't briefed to the Supreme Court on the stay, and therefore Justice Barrett wasn't given the opportunity to consider it when she wrote her controlling concurrence. Can you respond and share the federal government's view on that? If you could give me a little bit more color on exactly what the issue that you're referring to is. In terms of the grant terminations, they're saying that the grant terminations can be addressed as a remedy for the vacatur of the, in other words, if the district court has subject matter jurisdiction to rule on the challenge directives, whether they were arbitrary and capricious, which the Supreme Court, based on the controlling concurrence, said it did, then it should also be able to order the remedy of vacating the grant terminations, even if a freestanding grant terminations claim couldn't have been heard in the district court. That's what I'm asking you. Sure. So sorry for requesting additional clarification. But I guess, three points. First, that was the view of the minority. The minority thought that because the district court had jurisdiction to consider the guidance, it necessarily had jurisdiction to consider the terminations. That was not the controlling majority. Secondly, I think Justice Barrett's concurrence does explain why that is the erroneous way to look at the case. The separate claims, challenges to the guidance and challenges to the terminations, are legally distinct and have to be analyzed separately. And here, the separate analyzing of the grant terminations claim reveals that it is, in fact, precluded by the Tucker Act because it is a contract-based claim. I guess what I'm asking is, can you directly address the Patchak decision? I don't know if I'm saying it correctly, but that particular decision. I understand your arguments about the Supreme Court's stay opinion. But that is another binding Supreme Court decision that we have to apply in trying to figure out how to decide this case. So can you just address the Patchak decision more accurately? I just think that to the extent that there are other scenarios where a court might have jurisdiction to address agency action undertaken pursuant to an improper rule, the issue in that case is whether or not there's some independent bar to the review of the agency action. And in this case, there is. And I think that's determinative. But I thought Patchak concerned exactly this issue, which is, what does the Tucker Act preclude or not preclude? So how can we square what the Supreme Court said in the stay order with what it said in that conclusive merits decision in Patchak? Well, I don't think that there's any inconsistency. I think, again, I think the court and its stay decision in Justice Barrett's controlling concurrence said that they're separate. And you analyze each on its own. And that to the extent that the Tucker Act precludes jurisdiction on the district court's reversal of the grand terminations, that that is enough to answer the question. And I think that that was the conclusion that this court reached just yesterday. Thank you. Thank you, counsel. That concludes argument in this case.